*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
ASAH; SPECTRUM360, VERONA;   :     Civil Action No. 16-3935 (FLW) (DEA)
SPECTRUM360, LIVINGSTON;    :
MICHELE HOMA; HOLLYDELL    :         **OPINION**
SCHOOL, HURFFVILLE; *and*      :
MAUREEN GROSSI,             :
:
           Plaintiffs,   :
:
     v.             :
:
NEW JERSEY DEPARTMENT OF   :
EDUCATION; KIMBERLY      :
HARRINGTON; KEVIN DEHMER; *and* :
ELISE SADLER-WILLIAMS,    :
:
          Defendants.  :
_____ :

**WOLFSON, United States District Judge:**

Plaintiffs ASAH, Spectrum360, Verona, Spectrum360, Livingston, Michele Homa, the

HollyDELL School, Hurffville ("HollyDELL"), and Maureen Grossi (collectively, "Plaintiffs")

bring this case against Defendants the New Jersey Department of Education (the "Department"

or "DOE"), Kimberly Harrington, in her official capacity as the Department's Commissioner of

Education, Kevin Dahmer, in his official capacity as the Department's Chief Financial Officer

and Assistant Commissioner in the Division of Finance, and Elise Sadler-Williams, in her

official capacity as the Department's Planning Associate (collectively, "Defendants"), asserting

various state and federal constitutional claims challenging the Department's regulations

governing tuition reimbursement for approved private schools for students with disabilities.

Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint,

1

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. For the reasons that follow, Defendants' Motion to Dismiss is granted in part and denied in part, as follows: (i) Defendants' Motion is granted, insofar as Defendants seek to dismiss Plaintiffs' federal claims, asserted in Counts One, Two, Three, and Five of the Amended Complaint; and (ii) because this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, Defendants' Motion is denied without prejudice as to those claims.

## I.  FACTUAL BACKGROUND[1]

Before recounting the relevant factual background and procedural history of this case, I will briefly review the relevant statutory and regulatory context in which Plaintiffs' claims arise.

### A.  Statutory and Regulatory Framework

Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, each state that receives federal education funding must "ensure that disabled children receive a 'free appropriate public education' (FAPE)." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 425-26 (3d Cir. 2013) (quoting 20 U.S.C. § 1412(a)(1)); *see H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 873 F.3d 406, 408 (3d Cir. 2017). The IDEA "protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K. v. Abington Sch. Dist.*, 696

---

[1] For the purposes of the instant Motion, the Court will accept as true the facts alleged in the Amended Complaint, drawing all inferences in favor of Plaintiffs, the non-moving parties. *See Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010) (observing that, on a motion to dismiss, the court must "accept all factual allegations as true, construe the . . . complaint in the light most favorable to [the plaintiff], and determine whether, under any reasonable reading of the amended complaint, he may be entitled to relief.").

F.3d 233, 244 (3d Cir. 2012) (citation omitted).  To comply with the IDEA, "school districts must identify and evaluate all children who they have reason to believe are disabled under the statute." *Munir*, 723 F.3d at 426.  To provide a FAPE, the school district must develop and administer an Individualized Education Program ("IEP") for each student that is classified as eligible for special education.  *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 264 (3d Cir. 2003); *see C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) ("The FAPE required by the Act is tailored to the unique needs of the child by means of an [IEP].").  "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress."  *Cape Henlopen*, 606 F.3d at 65.  While the school district is "not required to 'maximize the potential'" of each child, *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (quoting *Bd. of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n. 21 (1982)), it "must offer an IEP that is 'reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'"  *Munir*, 723 F.3d at 426 (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009)).

New Jersey has adopted a host of regulations that are designed to fulfill the state's responsibilities under the IDEA.  *P.N. v. Greco*, 282 F. Supp. 2d 221, 234 (D.N.J. 2003).  In relevant part, each school district in New Jersey is obligated "to provide suitable facilities and programs of education for all the children who are classified as children with disabilities."  N.J.S.A. § 18A:46-13.  "A school district that is unable to deliver those required services, in full or in part, may satisfy its obligation by sending the special-needs student to a facility or program approved by the Department," such as Spectrum360, Verona, Spectrum360, Livingston

(collectively, "Spectrum360"), or HollyDELL. *Youth Consultation Serv., Inc. v. New Jersey State Dep't of Educ.*, No. A-4336-06T1, 2008 WL 794573, at *1 (N.J. Super. Ct. App. Div. Mar. 27, 2008); *see* N.J.S.A. § 18A:46-14(g). As the Court explains, *infra*, these approved private schools for students with disabilities ("APSSDs")[2] are "authorized to charge the sending districts for the cost of tuition for each child sent to their schools; however, the calculation of the tuition rates is strictly regulated." *Windsor Learning Ctr., Inc. v. New Jersey State Dep't of Educ., Office of Compliance*, No. A-2197-06T1, 2008 WL 113992, at *3 (N.J. Super. Ct. App. Div. Jan. 3, 2008).

Private schools that seek to contract with public schools to accept students with disabilities on a tuition basis must first be approved by the Department. *See* N.J.S.A. § 18A:46-15; N.J.A.C. § 6A:14-7.2. As part of the approval process, APSSDs must submit an affidavit attesting that they will comply with, *inter alia*, the IDEA and all applicable New Jersey statutes and regulations, including those governing tuition reimbursement. *See* N.J.A.C. § 6A:14-7.2(a)(3). To receive students with disabilities from a sending district, APSSDs are required to enter into a mandated form tuition contract (the "Tuition Contract") with the sending district. N.J.A.C. § 6A:14-7.8(b) ("The district board of education shall establish a written contract for each student with a disability it places in a program approved under this subchapter. . . . For students placed in an [APSSD], the district board of education shall use the mandated tuition

---

[2] The New Jersey Administrative Code (the "N.J.A.C." or "Code") defines an "APSSD" as "an entity approved by the Department according to N.J.A.C. 6A:14-7.1 through 7.3 to provide special education and related services to a student with disabilities placed in the APSSD by a parent/guardian, sending district board of education, or State agency responsible for providing the student's education through implementation of his or her individualized education program (IEP)." N.J.A.C. § 6A:23A-18.2.

contract according to N.J.A.C. 6A:23A–16 through 22."); N.J.S.A. § 6A:23A-18.5(a)(13). Here, the Tuition Contract provides, in relevant part, as follows:

> 3.     . . . The SENDING DISTRICT and APPROVED PRIVATE SCHOOL agree to comply with all the requirements promulgated by the Commissioner of Education and the State Board of Education, as applicable.
>
> 4.     Tuition charges, as part of this AGREEMENT, as well as the payment of the same shall be made in accordance with the applicable New Jersey Statutes and the rules and regulations of the State Board of Education.

Amended Verified Complaint ("Am. Compl."), Ex. A at ¶¶ 3-4.[3]

As noted, APSSD tuition reimbursement is governed by New Jersey law and the Department's regulations. Specifically, New Jersey law provides that the tuition rates charged by APSSDs cannot "exceed the actual cost per pupil as determined under rules prescribed by the commissioner and approved by the State Board of Education." N.J.S.A. § 18A:46-21; *see* N.J.A.C. § 6A:23A-18.3(a) ("The board of directors of an APSSD . . . shall determine the final tuition rate charged to be an amount less than or equal to the certified actual cost per student as determined by an independent school auditor."). To ensure compliance with this statutory requirement, the Department has promulgated a set of administrative regulations that "establish requirements for accounting, financial reporting, and tuition rate setting by [APSSDs]."

---

[3] Although a district court generally cannot consider matters extraneous to the pleadings on a motion to dismiss, 'a document *integral* to or *explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'" *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original). Accordingly, because Plaintiffs attach several documents to the Amended Complaint, including the Tuition Contract and various memoranda issued by the Department, the Court may consider these documents on this Motion. *See Marks v. Struble*, 347 F. Supp. 2d 136, 143 (D.N.J. 2004) (stating that, on a motion to dismiss, courts "generally only considers the allegations in the complaint, exhibits attached to the complaint, and public records," and that courts cannot consider matters extraneous to the pleadings).

N.J.A.C. § 6A:23A-18.1, *et seq.*[4]  In the case at bar, Plaintiffs challenge the Department's enforcement of these regulations governing APSSD tuition reimbursement.

As an initial matter, the Department's rules define "actual costs per student," in relevant part, as "the actual allowable cost for the entire school year," N.J.A.C. § 6A:23A-18.2, and state that APSSDs "may charge one tuition rate per school location for the school year." N.J.A.C. § 6A:23A-18.3(b).  When determining the actual allowable costs for the program, APSSDs must ensure that the costs are:

> i. Based on all costs required for student instruction from July 1 through June 30;
>
> ii. Consistent with the students' [IEPs];
>
> iii. Inclusive of all costs required to implement all students' IEPs and all related services,[5] except as set forth in [N.J.A.C. § 6A:23A-18.3(a)(5)];
>
> iv. Reasonable, that is, ordinary and necessary and not in excess of the cost that would be incurred by an ordinarily prudent person in the administration of public funds; and

---

[4] As the Court explains in further detail, *infra*, on July 3, 2017, the New Jersey State Board of Education amended the regulations governing APSSD tuition reimbursement.  In the Amended Complaint, Plaintiffs assert constitutional challenges to both the regulations that were in place prior to the 2017 amendments and the post-amendment regulations.  Because, with limited exceptions, the substance of those regulations remained the same following the July 2017 amendments, except where noted, the Court will cite the post-amendment regulations for ease of reference.

[5] The N.J.A.C. defines "related services" as follows:

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

N.J.A.C. § T. 6A, Ch. 14, 6A:14 App. B; *see* N.J.A.C. §§ 6A:14-1.3 and § 6A:23A-18.2.

> v. Based on goods actually received and placed in service and/or services rendered in the
> fiscal year expensed.

N.J.A.C. § 6A:23A-18.3(a)(1).  The regulations further provide that, with the exception of

extraordinary services,[6] APSSDs "shall provide required related services in the scope of services

rendered pursuant to the tuition contract and *may not bill* the sending district board of education

*separately* for related services that are required by a student's initial or any subsequent IEP with

limited exception."  N.J.A.C. § 6A:23A-18.3(a)(5) (emphasis added).  In short, with the

exception of extraordinary services, which are billed separately, an APSSD must include the cost

of all services necessary[7] to implement a student's IEP in the tuition rate charged to the sending

district.  *See* N.J.A.C. § 6A:23A-18.3(a).

     As a condition for their continued approval to accept students from sending districts,

APSSDs must submit audited financial statements for the Department's review.  N.J.A.C. §

6A:23A-18.10(a).  As part of this process, the APSSD must "ensure the audited financial

statements reflect the certified actual cost(s) per student as determined by an independent auditor

and final tuition rate(s) charged at the end of the school year as determined by the APSSD's

management."  N.J.A.C. § 6A:23A-18.10(c).  Failure to comply with the audit requirement may

result in the APSSD being placed on conditional approval status.  N.J.A.C. § 6A:23A-18.10(j).

     Plaintiffs' Amended Complaint challenges both the Department's regulations that were in

place prior to July 3, 2017 (the "Prior Regulations"), as well as the regulations that went into

effect after July 3, 2017 (the "July 2017 Regulations").  The Prior Regulations provided that if

the APSSD paid a salary for certain positions that exceeded the salary maximum set forth in

---

[6] The N.J.A.C. defines "extraordinary services" as "the services of a one-to-one aide, or one-to-one nurse, for a student as required by the student's [IEP]."  N.J.A.C. § 6A:23A-18.2.
[7] The Department has promulgated a list of costs which are "non-allowable" in the calculation of the certified cost per student.  *See* N.J.A.C. § 6A:23A-18.6.

(prior) N.J.A.C. § 6A:23A-18.2(o), the excess was a non-allowable cost, which could not be included in calculating tuition.  N.J.A.C. § 6A:23A-18.5(a)(8)-(9).  The Prior Regulations further provided that an APSSD's allowable salary costs had to conform to "the list of maximum allowable salaries by job title and county according to the job titles contained in N.J.A.C. 6A:9B."  N.J.A.C. § 6A:23A-18.2(o).  Except for administrative job titles, maximum allowable salaries were based on the highest contracted salary in the prior year for the same job title and county.  *Id.*

On July 3, 2017, the New Jersey State Board of Education amended the regulations governing the maximum allowable salary rates that APSSDs could include in the costs of tuition.  Specifically, although the July 2017 Regulations set the maximum salary rate for each position as they were determined under the Prior Regulations, N.J.A.C. § 6A:23A-18.3(o)(1), they also provide exceptions for the positions of occupational therapist, physical therapist, and speech and language specialist (the "Relevant Positions") at issue in this case.  In that regard, the July 2017 Regulations provide, in relevant part, as follows:

> (o) An APSSD shall reference as guidance the Commissioner-published list of maximum allowable salaries by job title and county, according to the job titles contained in N.J.A.C. 6A:9B relevant to APSSDs. Except for administrative job titles referenced in (p) below, maximum allowable salaries are based on the highest contracted salaries (not including payment of unused sick and vacation days and severance pay) of certified staff by job title in a district board of education for any prior year, indexed by the average increase in salary between the two preceding school years for each job title. The salaries are based on a 12-month contract period from July 1 through June 30 and the maximum allowable salary of an APSSD staff member shall be prorated for staff employed for less than 12 months. Under no circumstances shall the maximum allowable salary calculated be less than the corresponding salary in the prior year for the same job title and county. Unrecognized job titles shall be correlated to similar job titles in public schools based on their functional activities. The maximum allowable salary of a staff member holding a part-time or split-time position shall be prorated including the salary of staff employed in entities defined in (e) and (f) above.

> 1. Effective July 1, 2017, through June 30, 2024, maximum allowable salaries pursuant to (o) above shall be published at the rates contained in the maximum

allowable salary list published for the 2016-2017 school year, with the following exceptions:

> i. Beginning July 1, 2017, the maximum published salaries for the job titles of occupational therapist, physical therapist, and speech and language specialist shall increase annually from the 2016-2017 published list of maximum allowable salaries by CPI[8] determined consistent with N.J.S.A. 18A:7F-45;

> ii. Beginning July 1, 2017, the Commissioner, or his or her designee, shall publish a maximum allowable salaries list that contains the total maximum hourly rate for occupational therapists, physical therapists, and speech and language specialists contracted by APSSDs as purchased service providers or independent contractors. The published total hourly rates shall include an allowance of 35 percent more than the maximum allowable salary rate calculated and published pursuant to [(o)(1)(i)] above for the same job titles. The total maximum hourly rates shall be applicable only to contracted service providers.

> iii. Beginning July 1, 2017, an APSSD may contract with an approved clinic and agency pursuant to N.J.A.C. 6A:14-5.1(c) and 5.2 and may pay the approved clinic or agency for the contracted services at a rate above the maximum allowable salary published rate detailed in (o) above, so long as the APSSD:

>> (1) Acquires quotes for the contracted services from at least three approved clinics or agencies prior to contracting with an approved clinic or agency. If any of the three approved clinics or agencies are a related party, the APSSD shall contract with the lowest of the three quotes; and

>> (2) Provides documentation of the three quotes required by [(o)(1)(iii)(1)] above to the Department upon request.

N.J.A.C. § 6A:23A-18.3(o). Finally, under the July 2017 Regulations, APSSDs can request that the Commissioner of Education approve a salary higher than the maximum allowable salary for "no more than two APSSD employees in any fiscal year in which the APSSD demonstrates, to the Commissioner's or his or her designee's satisfaction, the maximum allowable salary is inadequate and would cause a hardship to the APSSD." N.J.A.C. § 6A:23A-18.3(r).

---

[8] The CPI is set forth in N.J.S.A. § 18A:7F-45.

## B.     The Parties

ASAH is a not-for-profit organization, comprised of approximately 160 private schools and agencies in New Jersey.  Am. Compl. ¶¶ 1, 48-49.  Spectrum360[9] and HollyDELL[10] are APSSDs.  *Id.* at ¶¶ 2-3, 5.  Michele Homa is an occupational therapist and the co-owner of AJL Therapy for Kids ("AJL"), a New Jersey entity that provides occupational therapy services to public and private students, including students attending Spectrum360.  *Id.* at ¶ 4.  Maureen Grossi is a physical therapist at HollyDELL.  *Id.* at ¶ 6.

The New Jersey Department of Education is a state agency that administers state and federal programs affecting more than 1.4 million public and non-public elementary and secondary school children in New Jersey.  *Id.* at ¶ 6.  Kimberly Harrington is the Department's Commissioner of Education.  *Id.* at ¶ 8.  Kevin Dahmer is the Department's Chief Financial Officer and Assistant Commissioner in the Division of Finance.  *Id.* at ¶ 9.  Elise Sadler-Williams is the Department's Planning Associate.  *Id.* at ¶ 10.

## C.     Plaintiffs' Claims

According to the Amended Complaint, prior to June 2015, the Department had a decades-long practice of permitting APSSDs "to obtain full reimbursement for related-services [provided to students with disabilities], provided that the related-services were administered in fulfillment of students' IEPs and were provided by qualified employees or approved agencies."  *Id*. at ¶ 85.

---

[9] According to the Amended Complaint, each student attending Spectrum360 "has been classified by his/her local public school district as eligible to receive special education and related services pursuant to the [IDEA] and New Jersey statutes and regulations governing the education of students with disabilities."  Am. Compl. ¶ 57.

[10] Plaintiffs allege that each student attending HollyDELL "has been classified by his/her local public school district as eligible to receive special education and related-services pursuant to the [IDEA] and New Jersey statutes and regulations governing the education of students with disabilities."  Am. Compl. ¶ 71.

Plaintiffs allege that the Department also permitted sending districts to send their own staff to assist APSSDs in providing related services to students with disabilities, without charge to these APSSDs. *See id.* at ¶ 86. Plaintiffs further allege that APSSDs, such as Spectrum360 and HollyDELL, relied on the Department's practice of permitting full reimbursement in annually acquiring related services at an amount sufficient to fulfill the requirements of students' IEPs. *See id.* at ¶ 87.

On June 16, 2015, the Department issued a memorandum entitled, "Private Schools for Students with Disabilities Costs for Related Services" (the "June Memorandum"), which states:

> It has come to the attention of the Department of Education that some [APSSDs] are charging sending districts separately for related services, or requiring districts to provide their own related services staff to implement IEPs. Department regulations require [APSSDs] to include the costs of special education related services in their tuition rates and that they can only charge separately for one-to-one aides for students . . . .
>
> . . .
>
> Therefore, the [APSSDs] must immediately cease this practice and ensure that all educational and related services are delivered, as specified in the students' IEPs.

Am. Compl., Ex. B.

On February 9, 2016, the Department issued a follow up memorandum (the "February Memorandum") that addressed frequently asked questions regarding the June Memorandum. *See id.* at Ex. C. After setting forth the definitions of extraordinary services under N.J.A.C. § 6A:23A-18.1 and related services under N.J.A.C. § 6A:14-1.3 and 3.9, the February Memorandum provides, in pertinent part:

> **3. Who pays for the cost of related services in an [IEP] for a student placed in an APSSD?**
>
> > For students placed in APSSDs, the cost of all related services within an IEP must be included in the tuition rate. See N.J.A.C. 6A:23A-18.2(a)1 and 18.2(a)5. The APSSDs shall not charge sending districts separately for related services that are required by a student's IEP. An APSSD shall only charge separately for

extraordinary services . . . . All other services shall be included as part of the tuition rate.

By way of example, if a student enrolled in an APSSD has an IEP that requires counseling services twice per week individually, the APSSD must implement the IEP to ensure that the required counseling services are provided. The cost for the provision of the counseling services, pursuant to N.J.A.C. 6A:23A-18.5(a), shall be included in the calculation of the certified actual cost per student and final tuition rate charged to sending districts. The APSSD cannot separately bill the sending district for any IEP required services other than extraordinary services . . . .

. . .

**5. What if the related service(s) contained in a student's IEP are unique and/or need to be provided after school hours?**

Given the nature of related services and the broad definition within the IDEA, it is possible that an IEP may require the provision of uncommon or unique related services. The type of related service must be clearly delineated in the IEP. Additionally, some related services may need to be provided after hours if required by a student's IEP.

The APSSD must determine whether it can provide the related service(s) detailed in the student's IEP. If it can, the cost of same must be included within the tuition rate for the sending district. If the APSSD cannot provide the service, the APSSD must immediately notify the sending district that the student will need to be placed elsewhere because it cannot provide the required service(s).

. . .

**12. Can the APSSD pay more than the maximum salary for related service providers?**

No, pursuant to N.J.A.C. 6A:23A-18.5(a)8 and 9, staff members or consultants cannot be paid in excess of the applicable maximum allowable salary.

*Id.* at 1-3.

Plaintiffs allege that the Department "announced a reversal of its prior practices" through the June Memorandum and the February Memorandum (collectively, the "Memoranda"), and that "[t]his reversal occurred at the end of the 2014-15 school year – after IEPs had been developed for the 2015-16 school year, after [APSSDs] had admitted students in reliance on the

[Department's] past permissions regarding [the] related-service provision, and after [APSSDs] had already established their budgets for the coming 2015-16 school year." Am. Compl. ¶¶ 91-92. Additionally, despite this alleged reversal of practice, Plaintiffs aver that the Department nonetheless "required [APSSDs] to provide all mandated IEP services – without the use of district personnel and without billing districts separately in order to afford the services." *Id.* at ¶ 93. In short, Plaintiffs allege that the Department "abruptly increased the amount of related-services [that APSSDs] would be required to provide directly, while limiting the funds [APSSDs] might use to purchase the services."[11] *Id.* at ¶ 95.

According to the Amended Complaint, the alleged reversal in the Department's policies regarding tuition reimbursement for APSSDs resulted in a myriad of consequences for both APSSDs and related service providers. With respect to HollyDELL and Ms. Grossi, Plaintiffs allege that as a result of the Department's "decision to enforce its unlawful maximum salary," HollyDELL could not give Ms. Grossi an annual increase in salary. *Id.* at ¶ 104. Plaintiffs further allege that, in order to maintain Ms. Grossi's income for the 2015-16 school year, HollyDELL "was forced to increase Ms. Grossi's hours from 27 per week to 32 per week, while reducing her hourly rate from $80.39 to $68.38." *Id.* at ¶ 105. Plaintiffs aver that Ms. Grossi's plans for retirement have been delayed as a result of these salary limitations. *Id.* at ¶ 108. Additionally, Plaintiffs allege that an experienced occupational therapist declined HollyDELL's offer of employment, because her "then-current rate for services exceeded the maximum salary permitted by the DOE." *Id.* at ¶ 112. Plaintiffs further allege that, although HollyDELL

---

[11] Plaintiffs further allege that the Department "did not and does not similarly limit related-service provider costs for public entities servicing students with disabilities," and that certain "[e]ntities, such as county special schools and jointure and educational service commissions, may pay for related-service expenses at a virtually unlimited rate and acquire a virtually unlimited amount of services." Am. Compl. ¶¶ 96-97.

eventually filled the occupational therapist position, due to the salary limitations imposed by the Department, it was forced to hire a recent graduate with little experience. *Id.* at ¶ 113.

Plaintiffs also assert that the Department's salary restrictions adversely affected Spectrum360 and its related service providers, including Ms. Homa. Specifically, Plaintiffs allege that Spectrum360 had to adjust its speech therapists' salaries to comply with the Department's maximum allowable salary for speech language therapists in Essex County during the 2014-2015 school year, $74 per hour, which was "far below market value and far below what public entities servicing students with special needs are permitted to spend on speech language services." *Id.* at ¶¶ 114-18. Additionally, Plaintiffs allege that one Spectrum360 student needed a highly specialized feeding therapy, and that the speech therapist who was qualified to provide that service had an hourly rate of $180 per hour. *See id.* at ¶¶ 119-120. According to the Amended Complaint, although Spectrum360 was able to obtain the specialized therapy for $130 per hour, the arrangement still exceeded the Department's maximum allowable salary by $50 per hour. *Id.* at ¶ 121. Similarly, Plaintiffs allege that Spectrum360 was unable to acquire physical and occupational therapy services for less than $88 per hour during the 2014-2015 school year, which exceeded the Department's maximum of $72 per hour for Essex County and was "far below market value and far below what public entities servicing students with special needs are permitted to spend on physical and occupational therapy services." *Id.* at ¶¶ 124-27. In total, Plaintiffs allege that, as of June 2016, Spectrum360 "stood to lose almost $150,000 for related-service costs in excess of the DOE's maximum." *Id.* at ¶ 139.

With respect to AJL and Ms. Homa, the Amended Complaint alleges that, prior to the Department's Memoranda, AJL's occupational and physical therapists generally earned $88-95 per hour from APSSDs, as compared to $95-150 hourly from public entity schools servicing

students with disabilities. *See id*. at ¶¶ 127-28. Plaintiffs allege that as a result of the Department's maximum salary restrictions, AJL was forced to reduce the rates of all of its therapists and implement a salary freeze. *See id*. at ¶¶ 129-30. According to the Amended Complaint, AJL anticipates that it may lose two experienced therapists as a result of the salary reduction and freeze and does not anticipate being able to replace those therapists with other experienced therapists at the lower rate. *Id*. at ¶¶ 131-32.

Plaintiffs further allege that, despite the change in the Department's treatment of maximum salaries for related service providers – as reflected in the enactment of N.J.A.C. § 6A:23-18(o)(1) – the Department "has continued to enforce the terms of its challenged [M]emoranda and the challenged regulations in financial audits for the 2014-15 school year." *Id*. at ¶¶ 147-48. Plaintiffs also aver that "the new regulations have done nothing to eliminate the inequities between [APSSD] and public school related-service cost limitations." *Id*. at ¶ 150.

Based on these allegations, the Amended Complaint asserts eight claims against Defendants. Count One asserts that Defendants discriminated against APSSDs and their affiliates, in violation of the Equal Protection Clause of the Fourteenth Amendment, by: (i) requiring Plaintiffs to adhere to the Department's Memoranda and regulations; (ii) prohibiting APSSDs from being able to procure identical related services for students with disabilities at the same rate as public entities; and (iii) prohibiting APSSD related service providers from receiving the same compensation as service providers for public schools. *See id*. at ¶¶ 151-56. In connection with Count One, Plaintiffs seek a declaration that the Memoranda and the Department's regulations violate the Equal Protection Clause, as well as an order "permitting [APSSDs] to procure related-services at any rate and amount necessary to implement students'

[IEPs] or permitting [APSSDs] to procure related-services in amounts and at rates equal to public entity schools." *Id.* at 24.

In Count Two, Plaintiffs raise a procedural due process claim, alleging that Defendants violated the Due Process Clause of the Fourteenth Amendment when the Department "reversed its position regarding the enforcement of maximum salaries for related-service providers and its requirement that related-services be provided directly by [APSSDs], absent notice and opportunity to be heard." *Id*. at ¶¶ 158-161. In connection with Count Two, Plaintiffs seek a declaration that the Department's actions amounted to a taking of Plaintiffs' liberty and property without due process of law, and thus, request an order invalidating the Memoranda "and the restraints imposed therein." *Id.* at 25.

In Count Three, Plaintiffs assert a related substantive due process claim, alleging that Defendants deprived Plaintiffs "of economic liberty via unlawful contract and compensation limitations." *Id.* at ¶¶ 163-66. In connection with Count Three, Plaintiffs seek a declaration that the Memoranda, the Prior Regulations, and the July 2017 Regulations violate the Due Process Clause, and request the entry of an order: (i) "establishing that [APSSD] related-service providers may contract for compensation at market rate or for any rate allowed for related-service providers servicing disabled students in public entity schools"; (ii) "establishing that work hours for [APSSD] related-service providers may not be reduced or increased to meet any maximum salary amount determined by the [DOE]"; and (iii) "granting [APSSD] related-service providers compensation for any sums to which they were previously entitled, but for the imposition of the [DOE's] salary limitation." *Id.* at 26-27.

In Count Four, Plaintiffs allege that by causing "municipalities and school boards to remove, or seek to remove, disabled students from their appropriate placements at [APSSDs]

based on related-service provision and associated costs," the Department has deprived these students of a thorough and efficient education, in violation of Article VIII, Section IV of the New Jersey Constitution. *Id*. at ¶¶ 167-71. In connection with Count Four, Plaintiffs seek a "declaration that local municipalities and school board may not insist that students be removed from appropriate [APSSDs] or forfeit their related-services in order to remain." *Id.* at 28.

In Count Five, Plaintiffs assert a claim for "unconstitutional impairment of contracts" under Article I, Section 10 of the United States Constitution and Article IV, Section 7 of the New Jersey Constitution, alleging that: (i) Defendants "mandated the form of contract that [APSSDs] must utilize in accepting students with disabilities for their respective districts"; (ii) "[t]hese contracts require [APSSDs] to ensure students' receipt of all related-services . . . prescribed by their IEPs"; and (iii) that Defendants, "by way of [the] maximum salary imposition, [have] simultaneously impaired [APPSDs'] ability to meet related-service requirements in accordance with students' mandated tuition contracts." *Id.* at ¶¶ 172-76. In connection with Count Five, Plaintiffs seek a declaration that the Department's maximum salary requirements "unconstitutionally impaired [APSSDs'] related-service obligations under their mandated tuition contracts," and, accordingly, request an order "invaliding maximum salary requirements for [APSSD] related-service providers." *Id*. at 29.

In Count Six, Plaintiffs allege that Defendants violated the mandatory rule-making procedures set forth under the New Jersey Administrative Procedure Act ("NJAPA"), N.J.S.A. § 54:14B-1, *et seq.*, by reversing the Department's practice of permitting APSSDs to receive full reimbursement for the costs of related services and allowing sending districts to have their own staff provide related services to students in APSSDs. *Id.* at ¶¶ 177-81. In connection with Count

Six, Plaintiffs seek a declaration that Defendants violated the NJAPA and an order invalidating the Department's Memoranda. *Id.* at 30.

In Counts Seven and Eight, Spectrum360 and HollyDELL, respectively, assert stand-alone claims for declaratory and injunctive relief, alleging that the Department's enforcement of its maximum salary limitations prevents Spectrum360 and HollyDELL from honoring their legal obligation to implement students' IEPs. *See id.* at ¶¶ 182-85. In connection with those claims, Spectrum360 and HollyDELL seek declarations that the Department's regulations prevent them from fulfilling their legal obligations under the IDEA. *Id.* at 31-32. Spectrum360 also seeks an order compelling the Department to permit Spectrum360 "to receive full payment for all of its related-service expenses incurred in implementing students' IEPs using approved agencies and/or qualified personnel." *Id.* at 31.

## II. <u>PROCEDURAL HISTORY</u>

On June 30, 2016, ASAH, the Children's Institute ("TCI"), Ms. Homa and Grossi, HollyDELL, B.R. on behalf of M.R., and S.D. on behalf of W.D., commenced this action against the Department, asserting the following claims: (i) Count One—violation of the right to equal protection under the Fourteenth Amendment; (ii) Count Two—violation of the right to procedural due process under the Fourteenth Amendment; (iii) Count Three—violation of the right to substantive due process under the Fourteenth Amendment; (iv) Count Four—violation of the IDEA; (v) Count Five—violation of the right to a thorough and efficient education under the New Jersey Constitution; (vi) Count Six—impairment of contract under the United States and New Jersey Constitutions; and (vii) Count Seven—violation of the NJAPA. *See ASAH v. New Jersey Dep't of Educ.*, No. 16-3935, 2017 WL 2829648, at *6 (D.N.J. June 30, 2017).

Additionally, TCI, HollyDELL, and B.R. asserted claims for declaratory and injunctive relief, and B.R. and S.D. asserted claims for attorneys' fees under the IDEA. *See id*.

On November 4, 2016, the Department moved to dismiss the original Complaint in this matter. ECF No. 8. On June 30, 2017, this Court issued an Opinion and entered a corresponding Order dismissing the original Complaint. ECF Nos. 17-18. Specifically, this Court found, first, that, pursuant to the Eleventh Amendment, the Department was immune from the federal claims asserted in Counts One, Two, Three, and Six. *See ASAH*, 2017 WL 2829648 at *8. Second, the Court dismissed ASAH as a plaintiff because it lacked either organizational or associational standing. *See id*. at *8-9. Third, this Court dismissed Counts Four and Eleven for lack of standing on the ground that the students failed to allege a future injury that was imminent. *See id*. at *10-11. Finally, the Court dismissed the claims for declaratory and injunctive relief asserted in Counts Eight, Nine, and Ten, because such claims are not cognizable causes of action in the Third Circuit. *See id.* at *12. Nonetheless, the Court granted the plaintiffs leave to amend the claims asserted in Counts One, Two, Three, Five, Six, and Seven to assert claims against individual state officials. *Id.*

On October 2, 2017, Plaintiffs, with the exception of the parents of the individual students and TCI, filed the Amended Complaint, naming as Defendants the Department, as well as Harrington, Dahmer, and Sadler-Williams (collectively, the "State Officials") in their official capacities. ECF No. 23. As noted, the Amended Complaint alleges that the Department's regulations violated their federal and state constitutional rights to equal protection, due process, and contract, their state rights under New Jersey's corollary to the Contracts Clause, the thorough and efficient education clause of the New Jersey Constitution, and under the NJAPA. *See id*. Spectrum360 and HollyDELL also asserted separate stand-alone claims for declaratory and

injunctive relief.  *See id.*  On December 13, 2017, Defendants filed the instant Motion to Dismiss Plaintiffs' Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 28.  That Motion has been fully briefed.  ECF Nos. 31, 33.

## III.  LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim.  *See* FED. R. CIV. P. 12(b)(1).  "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); *see St. Thomas–St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional.").  "On a motion to dismiss for lack of standing, the plaintiff bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Ballentine*, 486 F.3d at 810 (citations and internal quotation marks omitted).

In evaluating a Rule 12(b)(1) motion to dismiss, the reviewing court must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed."  *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)).  "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'"  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted);

*see Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (observing that in reviewing a facial challenge, which contests the sufficiency of the pleadings, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co.*, 836 F.3d at 268. The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n. 3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268.

**B.      Federal Rule of Civil Procedure 12(b)(6)**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). Although Federal Rule of Civil Procedure 8(a)[12] does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the

---

[12] In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court reaffirmed that Federal Rule of Civil Procedure 8(a) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In accordance with the pleading requirements set forth in *Twombly* and *Iqbal*, the Third Circuit has formulated "a three-step process for district courts to follow in reviewing the sufficiency of a complaint." *Robinson v. Family Dollar Inc.*, 679 F. App'x 126, 131 (3d Cir. 2017); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the reviewing court "must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citation, quotation marks, and brackets omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (citation and quotation marks omitted). Finally, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (citation, quotation marks, and brackets omitted). This last step of the plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

IV.     **DISCUSSION**

Defendants argue that the Amended Complaint should be dismissed for three reasons. First, Defendants maintain that Plaintiffs' state and federal constitutional claims are barred under the Eleventh Amendment doctrine of sovereign immunity, and that no exceptions to immunity exist.  Second, Defendants contend that Plaintiffs' challenges to the Department's July 2017 Regulations are not justiciable, because Plaintiffs have failed to sufficiently allege the existence of an actual and imminent threat of future harm, as required under the doctrines of standing and ripeness.  Third, Defendants argue that even if this Court has subject matter jurisdiction, Plaintiffs' claims fail on the merits.  Because Plaintiffs' sovereign immunity and justiciability arguments implicate this Court's subject matter jurisdiction, the Court will address those arguments before turning to Defendants' non-jurisdictional bases for dismissal.[13]  *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007)) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction . . . .").

A.     **Eleventh Amendment Sovereign Immunity**

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  U.S. CONST. amend. XI.  "Under the Eleventh Amendment, 'an unconsenting State is immune from suits brought in federal courts by [its] own

---

[13] As the Court will discuss, *infra*, the dismissal of each of Plaintiffs' federal claims is warranted, and the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Accordingly, the Court's analysis of Defendants' Motion to Dismiss will focus exclusively on Plaintiffs' federal claims.

citizens.'" *Hyatt v. Cty. of Passaic*, 340 F. App'x 833, 836 (3d Cir. 2009) (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). Importantly for this case, the Eleventh Amendment protects not only states, but also state agencies and state officials acting in their official capacities, "as long as the state is the real party in interest." *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989); *see Shahin v. Delaware*, 563 F. App'x 196, 198 (3d Cir. 2014) ("A suit against the States, their agencies, and their employees acting in an official capacity is also barred, because it is merely another way of pleading an action against the state."); *Hyatt*, 340 F. App'x at 836 ("Eleventh Amendment immunity applies to state entities and officials if 'the state is the real, substantial party in interest.'") (citation omitted). "The party asserting Eleventh Amendment immunity 'bears the burden of proving its applicability.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) (quoting *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995)).

As noted, the Eleventh Amendment bars not only suits against states themselves, "but also suits for damages against 'arms of the State'—entities that, by their very nature, are so intertwined with the State that any suit against them renders the State the 'real, substantial party in interest.'" *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016) (citation omitted). To determine whether a suit against a state entity is actually a suit against the state itself, the Third Circuit has directed courts to consider the following three factors: "(1) the source of the money that would pay for the judgment; (2) the status of the entity under state law; and (3) the entity's degree of autonomy." *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 198 (3d Cir. 2008) (citing *Fitchik*, 873 F.2d at 659). While the Third Circuit historically placed primacy on the first factor – the state-treasury factor, the court "recalibrated the factors in light of the Supreme Court's observation in *Regents of the University of California*

*v. Doe*, 519 U.S. 425, 431 (1997), that an Eleventh Amendment inquiry should not be a

'formalistic question of ultimate financial liability.'" *Maliandi*, 845 F.3d at 84 (quoting *Regents*,

519 U.S. at 431). Accordingly, each of the three factors is now "considered 'co-equal,' and 'on

the same terms, . . . with courts determining and then weighing the qualitative strength of each

individual factor in the unique factual circumstances at issue." *Karns v. Shanahan*, 879 F.3d

504, 513-14 (3d Cir. 2018) (internal citations omitted).

Here, in arguing that the Department must be dismissed on sovereign immunity grounds,

Defendants note that the Court already found that the Department was entitled to sovereign

immunity in its June 30, 2017 Opinion. *See* Defs.' Br. at 14. Indeed, in my prior decision, I

rejected Plaintiffs' argument that the exception to sovereign immunity set forth in *Ex parte*

*Young*, 209 U.S. 123 (1908) applied to the Department, and thus, found that the Department was

entitled to sovereign immunity. *See ASAH*, 2017 WL 2829648 at *7-8. And, in response to the

instant Motion, Plaintiffs fail to present any new arguments as to why the Department is not

entitled to sovereign immunity. Accordingly, my finding that the Department is entitled to

sovereign immunity stands, and thus, Plaintiffs' federal claims are dismissed as to the

Department.

The Court's finding that Department is entitled to sovereign immunity does not end the

inquiry, however, because in the Amended Complaint, Plaintiffs assert federal claims against the

State Officials in their official capacities. In the context of sovereign immunity, actions against

state officers are subject to a slightly different standard than actions against state entities.

Specifically, while suits against a non-consenting state are barred by the Eleventh Amendment,

under the Supreme Court's holding in *Ex parte Young*, "a private plaintiff may sue state officials

for prospective injunctive relief to end ongoing violations of federal law." *Williams by &*

*through Bookbinder v. Connolly*, No. 17-3569, 2018 WL 1377775, at *2 (3d Cir. Mar. 19, 2018);

*Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318

(3d Cir. 2013). "The theory behind [*Ex parte Young*] is that a state officer lacks the authority to

enforce an unconstitutional state enactment, and thus the officer is 'stripped of his official or

representative character and becomes subject to the consequences of his individual conduct.'"

*Christ the King*, 730 F.3d at 318 (quoting *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*,

297 F.3d 310, 323 (3d Cir. 2002)). Significantly, plaintiffs filing suit against state officials under

*Ex parte Young* "may not be awarded damages or other forms of retroactive relief." *Christ the*

*King*, 730 F.3d at 318; *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (concluding that the

Eleventh Amendment barred an official capacity action for damages); *Edelman*, 415 U.S. at 676-

78 (holding that a suit against state official for retroactive monetary relief, which requires

payment of funds from state treasury, is barred by Eleventh Amendment). Instead, "their

remedies are limited to those that are 'designed to end a continuing violation of federal law.'"

*Christ the King*, 730 F.3d at 318 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

      This "bar on retroactive relief includes forms of equitable relief that are functionally

equivalent to damage awards." *Christ the King*, 730 F.3d at 319; *see Blanciak v. Allegheny*

*Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996) ("[R]elief that essentially serves to compensate a

party injured in the past by the action of a state official, even though styled as something else, is

barred by the Eleventh Amendment."). For example, in *Edelman*, the plaintiff, individually and

as a representative of a class, asserted that state officials were improperly administering benefits

under a federal-state aid program, and sought, *inter alia*, declaratory and injunctive relief to

award the class of plaintiffs all benefits that were wrongfully withheld. 415 U.S. at 655-56. At

both the trial and appellate levels, the courts rejected the officials' argument that the Eleventh

Amendment barred the award of retroactive benefits, and granted the plaintiff's request for injunctive relief.  *Id.* at 657-58.

In reversing the Court of Appeals' finding that the Eleventh Amendment did not bar the portion of the District Court's order that required a retroactive payment of benefits, the *Edelman* Court explained that although "the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State."  *Id.* at 668.  In so holding, the Court contrasted the relief sought by the plaintiff from the prospective relief sought in *Ex parte Young* and similar cases.  *See id*. at 664-68.  Specifically, the Court observed that the prospective relief sought in those cases – requiring only that state officials conform their future conduct to the requirements of federal law – would have an "ancillary effect on the state treasury."  *Id.* at 668.  Conversely, the Court found that a retroactive award of benefits in the plaintiff's favor would have required the payment of a substantial amount of money from the state treasury, "not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation" that would be "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials."  *Id.* Accordingly, because such an award "resemble[d] far more closely the monetary award against the State itself . . . than it [did] the prospective injunctive relief awarded in *Ex parte Young*," *id.* at 665 (internal citation omitted), the Court found that the plaintiff's request for retroactive benefits was barred by the Eleventh Amendment.  *Id.* at 668, 678.

Following *Edelman*, the label given to a plaintiff's requested relief "is of no importance" and courts "look to the substance rather than the form of the relief requested to determine whether [the plaintiff's] claims are barred by the Eleventh Amendment."  *Blanciak*, 77 F.3d at

698. The Eleventh Amendment does not bar relief that serves primarily "to bring an end to a present, continuing violation of federal law," with only an "ancillary effect" on the state's treasury. *Christ the King*, 730 F.3d at 319 (citation and quotation marks omitted). However, when an action "'is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.'" *Edelman*, 415 U.S. at 663 (quoting *Ford Motor Co. v. Dep't of Treasury of Indiana*, 323 U.S. 459, 464 (1945)).

Here, Defendants raise two sovereign immunity arguments with respect to the State Officials. First, Defendants argue that under *Ex parte Young* and its progeny, Plaintiffs' request in Count Three (Plaintiffs' substantive due process claim) – seeking an "Order granting [APSSD] related-service providers compensation for any sums to which they were previously entitled" – must be dismissed, because it is akin to a request for retroactive monetary damages. Second, Defendants contend that each of Plaintiffs' federal claims should be dismissed, because *Ex parte Young* only provides an exception to sovereign immunity for claims seeking injunctive relief to remedy a continuing violation of federal law, and "Plaintiffs have failed to allege any facts showing that there is indeed an ongoing violation of federal law." Pls.' Br. at 16.

With respect to Defendants' first argument, the Court agrees that Plaintiffs' request in Count Three – seeking an "Order granting [APSSD] related-service providers compensation for any sums to which they were previously entitled" – must be dismissed, because such an award would more closely approximate an award of retroactive monetary damages than prospective injunctive relief. Accordingly, that request is stricken from Count Three as barred under the doctrine of sovereign immunity.

Nonetheless, the Court finds that the State Officials are not entitled to immunity with respect to the remainder of Plaintiffs' federal claims. Specifically, contrary to Defendants' assertion, Plaintiffs do allege that Department's enforcement of its APSSD tuition reimbursement regulations amounts to a violation of federal law, and thus, that Defendants should be enjoined from continued enforcement of the same. For the purposes of the *Ex parte Young* exception, Plaintiffs need not establish that Defendants' conduct is, in fact, unconstitutional.[14] Accordingly, the Court proceeds to Defendants' other arguments for dismissing Plaintiffs' federal claims.[15]

**B.    Justiciability of Plaintiffs' Challenges to the Department's July 2017 Regulations**

Next, Defendants argue that Plaintiffs' claims challenging the July 2017 Regulations should be dismissed for lack of standing and because those claims are not ripe for judicial review.[16] Specifically, Defendants contend that Plaintiffs have failed to allege that the July 2017

---

[14] Indeed, although Defendants' couch these arguments within the confines of sovereign immunity, they are actually merits determinations, and thus, will be discussed in this Court's analysis of whether Plaintiffs satisfied the pleading standard.

[15] Because this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, it need not reach Defendants' arguments that sovereign immunity protects all Defendants against Plaintiffs' state law claims.

[16] Defendants also argue that this Court should preclude Plaintiffs asserting those claims in the Amended Complaint that challenge the Department's July 2017 Regulations, because such claims are outside the scope of this Court's prior Order granting Plaintiffs leave to file the Amended Complaint, and Plaintiffs failed to move for leave to amend under Federal Rule of Civil Procedure 15. As an initial matter, because the Department's regulations were not adopted until June 3, 2017, after all substantive briefing was completed on Defendants' initial motion and well after the filing of the original Complaint, the issue of whether Plaintiffs should be given leave to challenge those regulations was not before the Court at the time of this Court's June 30, 2017 Order. Additionally, while Defendants are correct that Plaintiffs never formally moved for leave to challenge the July 2017 Regulations, those regulations are substantially the same as the Prior Regulations, and thus, this Court finds that Plaintiffs were not required to move for leave to amend prior to challenging the same. In any event, in light of the liberal standard governing leave to amend under Federal Rule of Civil Procedure 15, this Court, in its discretion, permits Plaintiffs to include allegations challenging the July 2017 Regulations. *See Arthur v. Maersk,*

Regulations pose an imminent threat of future harm, and thus, that Plaintiffs have failed to satisfy the Article III requirement of injury in fact. Relatedly, Defendants contend that Plaintiffs' claims challenging the July 2017 Regulations are not ripe, because Plaintiffs have not alleged a non-speculative threat of future harm. *See* Defs.' Br. at 20 ("Whether Plaintiffs have standing or their claims are ripe both turn on whether the threat of future harm is sufficient to constitute a cognizable injury."). Because Plaintiffs' standing and ripeness arguments boil down to the same question in this case, the Court will address standing and ripeness in tandem. *See Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149, 167 n. 15 (3d Cir. 2016) (addressing standing and ripeness concomitantly, where "whether Plaintiffs have standing or their claims are ripe for adjudication both turn[ed] on whether the threat of future harm under the Statutes is sufficiently immediate to constitute a cognizable injury."); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n. 8 (2007) (observing that "[t]he justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing . . . or in terms of ripeness . . . .").

Article III of the United States Constitution confines the scope of federal judicial power to the adjudication of "cases" or "controversies." U.S. CONST. art. III, § 2. This "bedrock requirement," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), protects the system of separation of powers and respect for the coequal branches by restricting the province of the judiciary to "decid[ing] on the rights of individuals." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). Indeed, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the

---

*Inc.*, 434 F.3d 196, 202 (3d Cir. 2006) (observing that "Federal Rule of Civil Procedure 15 embodies a liberal approach to pleading," under which "leave 'shall be freely given when justice so requires.'") (quoting FED. R. CIV. P. 15(a)).

constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("In order to remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches.").

Courts have developed several justiciability doctrines to enforce the "case" or "controversy" requirement. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). "They include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009). Among those doctrines, the Article III doctrine "that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important . . . ." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The seminal standing question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[17] *Seldin*, 422 U.S. at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

To satisfy the "irreducible constitutional minimum" of Article III standing, the plaintiff must establish three well-settled elements:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

> Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.

---

[17] Ripeness is a separate doctrine from standing, but both doctrines originate from the same Article III requirement of a case or controversy." *Free Speech*, 825 F.3d at 167 n. 15.

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations, alterations, and citations omitted); *see Spokeo*, 136 S. Ct. at 1547 ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.").

The standing inquiry in this case centers on the "'[f]irst and foremost' of standing's three elements," injury-in-fact. *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). "The injury-in-fact requirement exists to assure that litigants have a 'personal stake' in the litigation." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005); *see Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) ("The purpose of the injury-in-fact requirement . . . is 'to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.'") (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). "Injury-in-fact is not Mount Everest." *Danvers*, 432 F.3d at 294. It demands only that the plaintiff allege "some specific, 'identifiable trifle' of injury." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (citation omitted).

To carry its burden on the injury-in-fact requirement, a "plaintiff must claim 'the invasion of a concrete and particularized legally protected interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical.'" *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citation omitted). When, as in this case, prospective injunctive relief is sought, "the plaintiff must show that he is '*likely* to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (emphasis added)); *see Summers v. Earth Island Inst.*,

555 U.S. 488, 493 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical . . . ."). In that regard, "[a]llegations of 'possible future injury' are not sufficient to satisfy Article III," *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)), and "[p]laintiffs do not allege an injury-in-fact when they rely on a 'chain of contingencies' or 'mere speculation.'" *Finkelman*, 810 F.3d at 193 (citation omitted). "Instead, [a] threatened injury must be certainly impending,' and 'proceed with a high degree of immediacy." *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) (citation and internal quotation marks omitted). "As a result of the immediacy requirement, '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *McNair*, 672 F.3d at 223 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). That said, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496.

Here, I note, as an initial matter, that Defendants' justiciability arguments focus solely on Plaintiffs' ability to assert claims based on the Department's July 2017 Regulations, not the Prior Regulations that were in place at the time of Plaintiffs' original Complaint. That is significant, because each of Plaintiffs' claims is premised on both the Department's Prior Regulations *and* the July 2017 Regulations. *See*, *e.g.*, Am. Compl. at 24 (seeking a "declaration that the enactment of N.J.A.C. 6A:23A-18.5(a)8 and 9 (in affect as of the original June 30, 2016 filing of this complaint) . . . and N.J.A.C. 6A:23A-18.3(o)(1) (in effect currently) . . . violate the Equal Protection Clause of the United States Constitution."). Equally important, Plaintiffs allege that, despite the enactment of the July 2017 Regulations, the Department "has continued to enforce

the terms of its challenged memoranda and the challenged regulations in financial audits for the

2014-15 school year" and "has commenced *retroactive* enforcement of the terms of its

challenged memoranda and the challenged regulations, seeking to disallow related-service costs

in excess of past maximum salary limitations in financial audits for school years *prior* to 2014-

15." *Id*. at ¶¶ 148-49 (emphasis in original). While, as this Court has already found, Plaintiffs

are limited to seeking prospective relief against the State Officials, to the extent that these audits

have not yet occurred, and to the extent Plaintiffs allege that Defendants continue to enforce the

Department's Prior Regulations, Plaintiffs have standing to challenge the constitutionality of

those regulations.

The analysis with respect to Plaintiffs' standing to challenge the Department's July 2017

Regulations is slightly different. In that regard, while the Amended Complaint places emphasis

on the impact of the Department's Prior Regulations on the Plaintiff-APSSDs and related service

providers, these allegations of past injury under a previous regulatory scheme, standing alone,

are insufficient to confer standing on Plaintiffs to seek prospective injunctive and declaratory

relief regarding the July 2017 Regulations. *See Free Speech*, 825 F.3d at 165-66 ("That some of

FSC's members have previously undergone searches pursuant to the regulations here is not

sufficient on its own to confer standing to seek injunctive relief."). Accordingly, the Court's

standing analysis turns on whether Plaintiffs have alleged a real and immediate threat of future

harm stemming from the July 2017 Regulations.

In arguing that Plaintiffs have failed to present a justiciable controversy with respect to

the July 2017 Regulations, Defendants contend that the Amended Complaint fails to address the

added flexibility provided under those regulations. Defs.' Br. at 18. Specifically, Defendants

note that, although the amended regulations set the maximum salary rate for each position in

reference to the 2016-2017 school year, N.J.A.C. § 6A:23A-18.3(o)(1), they provide exceptions for the Relevant Positions at issue in this case.  In that regard, Defendants submit that, beginning July 1, 2017, the regulations provide that:  (i) maximum published salaries for the Relevant Positions shall increase annually by the CPI from the 2016-17 published salary, *see* N.J.A.C. § 6A:23A-18.3(o)(1)(i); (ii) the published maximum allowable salaries list containing the total maximum hourly rate for the Relevant Positions will include an allowance of 35 percent more than the maximum allowable salary rate calculated and published pursuant to N.J.A.C. § 6A:23A-18.3(o)(1)(i) for those positions, *see* N.J.A.C. § 6A:23A-18.3(o)(1)(ii); (iii) that APSSDs may contract with approved clinics or agencies for contracted services above the maximum allowable published rates detailed in N.J.A.C. § 6A:23A-18.3(o)(1)(i), so long as the APSSD complies with certain requirements; *see* N.J.A.C. § 6A:23A-18.3(o)(1)(iii); and (iv) APSSDs can request that the Commissioner of Education approve a salary higher than the maximum allowable salary for "no more than two APSSD employees in any fiscal year in which the APSSD demonstrates, to the Commissioner's or his or her designee's satisfaction, the maximum allowable salary is inadequate and would cause a hardship to the APSSD."  N.J.A.C. § 6A:23A-18.3(r).  Defendants argue that the Amended Complaint is devoid of any allegations explaining how these regulations will negatively impact Plaintiffs, and thus, that Plaintiffs' alleged injury is conjectural.  I disagree.

Despite the lack of specific allegations concerning the impact of the "flexibility" provisions cited by Defendants, Plaintiffs have sufficiently alleged a real and immediate injury with respect to the July 2017 Regulations – that they will suffer "real costs as a condition of compliance with a regulation that they urge is unconstitutional."  *Free Speech*, 825 F.3d at 166. As the Third Circuit has observed, "[s]ufficient injury exists to confer standing where 'the

regulation is directed at [the plaintiffs] in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the . . . rule they are quite clearly exposed to the imposition of strong sanctions.'" *Id.* at 166 (citation omitted); *see Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (finding that standing existed where the plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), *vacated on other grounds*, 563 U.S. 1030 (2011). In *Free Speech*, the plaintiffs, a collection of individuals, entities, and interest groups engaged in the production of sexually explicit images, challenged the constitutionality of the recordkeeping, labeling, and inspection requirements set forth in various statutes and their accompanying regulations. 825 F.3d at 153. The government argued that the plaintiffs lacked standing to pursue injunctive relief, and that the plaintiffs' claims were not ripe, "because they have not demonstrated sufficient threat of injury and their claims of future harm are not redressable through injunctive relief given that no inspection program has been in place since 2008." *Id.* at 165.

Notwithstanding the lack of an existing inspection regime, the Third Circuit found that the plaintiffs had standing to pursue their constitutional claims, and that such claims were ripe, because, "even without a formal inspection regime in place, [the plaintiffs] . . . still [had to] comply with [the statutes'] requirements and be prepared to face an inspection without warning and at law enforcement's discretion." *Id.* at 166. As the court explained, the "cost of complying with this regulation thus affect[ed] each producer of sexually explicit images in a concrete way that is sufficient to establish an injury-in-fact." *Id.* Moreover, in rejecting the government's argument that the threat alleged – future inspection – was remote, the court placed significance on the fact that there was "no dispute that [the plaintiffs] intend to continue to engage in conduct

that subjects them to enforcement under [the statutes]." *Id*. Finally, the court found that, "although not sufficient on its own to support standing, the fact that some of [the plaintiffs] have been subjected to records inspections in the past makes the threat of future inspections more credible." *Id*.

For similar reasons, here, the Court finds that Plaintiffs have sufficiently alleged an immediate threat of future harm, such that Plaintiffs' constitutional claims are justiciable. Significantly, as in *Free Speech*, here, there can be no dispute that APSSDs and their related service providers are the direct targets of the Department's July 2017 Regulations, and that failure to comply with those regulations would expose APSSDs to the threat of losing their approved status. Additionally, the threat alleged by Plaintiffs – that APSSDs will not be fully reimbursed for the costs of related services provided students and that related service providers will not be compensated at the market rate – is not remote. The July 2017 Regulations indicate that they went into effect beginning July 1, 2017, and thus, directly impact APSSD tuition reimbursement and related service provider salaries on an ongoing basis.

Nor can the Court find that the provisions cited by Defendants – allegedly providing added flexibility for APSSDs to compensate related service providers – render Plaintiffs' claimed injuries entirely speculative. In that regard, even accepting Defendants' argument that these provisions give APSSDs added flexibility, the Court cannot conclude that the mere possibility that an exception to the general provisions governing tuition reimbursement may apply renders Plaintiffs' claims academic. Indeed, the Amended Complaint's allegations concerning the Department's enforcement of the maximum salary limitations set forth in the Prior Regulations, as well as the impact of that enforcement on related service provider salaries, lends credence to Plaintiffs' alleged future injury. *See Susan B. Anthony List v. Driehaus*, 134 S.

Ct. 2334, 2345 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'") (citation omitted). Moreover, Plaintiffs allege that "the new regulations have done nothing to eliminate the inequities between [APSSD] and public school related-service cost limitations." Am. Compl. ¶ 150. Under these circumstances, I conclude that Plaintiffs have sufficiently alleged a threat of future harm that is "actual and imminent, not conjectural or hypothetical," *Summers*, 555 U.S. at 493, and thus, that Plaintiffs have standing to challenge the July 2017 Regulations.[18] Accordingly, Plaintiffs' federal claims challenging the Department's July 2017 Regulations are justiciable.

### C. Plaintiffs' Federal Claims

Having found that this Court has jurisdiction to consider Plaintiffs' federal claims against the State Officials, the Court must determine whether Plaintiffs have met the pleading standard with respect to each of their federal claims. As noted above, Plaintiffs assert federal claims for: (1) violation of the Equal Protection Clause; (2) violation of the Due Process Clause; and (3) Violation of the Contracts Clause. The Court will examine each of these claims, in turn.

#### 1. Equal Protection Claim

In Count One of the Amended Complaint, Plaintiffs allege that the Department's regulations governing APSSD reimbursement tuition, including the disallowance of related service provider salaries that exceed the regulatory maximum, amount to discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution. *See* Am. Compl. ¶¶ 151-57. Specifically, Plaintiffs allege that the Department's regulations

---

[18] For the same reasons, I find that Plaintiffs' claims challenging the July 2017 Regulations are also ripe.

discriminate against APSSDs, because they prohibit APSSDs from procuring related services for students with disabilities at the same cost as public entities. *Id.* at ¶ 154.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). It provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. In reviewing an Equal Protection claim, a court must first determine "whether the alleged state action burdens a fundamental constitutional right or targets a suspect class." *State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 F. App'x 752, 754 (3d Cir. 2010). "If a 'classification neither burdens a fundamental right nor targets a suspect class, [the court] will uphold it so long as it bears a rational relation to some legitimate end.'" *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)). However, "a classification [that] trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage . . . must meet the strict scrutiny standard, under which a law must be narrowly tailored to further a compelling government interest." *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992) (citation and internal quotation marks omitted).

Here, the parties dispute the standard of review that governs Plaintiffs' Equal Protection Claim. In that regard, Defendants contend that rational basis review applies, because Plaintiffs are not members of a suspect class and the regulations do not implicate a fundamental right. Conversely, Plaintiffs argue that the Department's regulations both target a suspect class and burden a fundamental right. In that regard, Plaintiffs contend that the Department's regulations impose salary limitations on APSSDs and their related service providers, without imposing

similar limitations on public schools and their related service providers. *See* Pls.' Br. at 17. Additionally, Plaintiffs argue that students with disabilities are a suspect class and, "[d]ue to their association with private school students with disabilities, [APSSDs] and [APSSD] related-service providers are also members of a protected class and entitled to equal protection." *Id.* Finally, Plaintiffs maintain that the Department's regulations limit the ability of students with disabilities to receive the educational services mandated by their IEPs, and thus, that these regulations threaten the fundamental right to education. *See id.* at 18-19.

Plaintiffs' arguments in support of applying a strict scrutiny standard of review are without merit. At the outset, APSSDs and their related service providers are not suspect classes for the purposes of the Equal Protection Clause, because these groups are not "discrete and insular" minorities that have been "'subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (citation omitted); *see Griffin High Sch. v. Illinois High Sch. Ass'n*, 822 F.2d 671, 675 (7th Cir. 1987) ("[P]rivate schools have not historically been considered a suspect class."); *see also KDM ex rel. WJM v. Reedsport Sch. Dist.*, 196 F.3d 1046, 1052 (9th Cir. 1999) ("Because parochial school students are not a suspect class, scrutiny of their treatment by the state is under the rational basis test."). Moreover, even assuming that Plaintiffs have standing to assert an associational discrimination claim on behalf of students with disabilities, "[c]lassifications based on disability are subject to rational basis review because the disabled constitute neither a suspect nor a quasi-suspect class" for the purposes of the Equal Protection Clause of the Fourteenth

Amendment.[19] *Med. Soc'y of New Jersey v. Herr*, 191 F. Supp. 2d 574, 582 (D.N.J. 2002); *see Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3d Cir. 2007) ("[T]he disabled are not a suspect class for purposes of an equal protection challenge.") (citing *Cleburne*, 473 U.S. at 439); *Lavia v. Pennsylvania, Dep't of Corr.*, 224 F.3d 190, 199 (3d Cir. 2000) (observing that the "disabled are neither a suspect nor a quasi-suspect class" under the Equal Protection Clause).

Finally, although Plaintiffs cite *Abbott v. Burke*, 100 N.J. 269, 282 (1985) for the proposition that education is a fundamental right under *New Jersey law*, whether a right is entitled to protection under the Equal Protection Clause is a matter of *federal law*, and it is well settled that education is not a fundamental right for the purposes of the Equal Protection Clause. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."); *Bowers*, 475 F.3d at 553 (observing that "there is no fundamental right to public education . . . ."); *Thomas v. E. Orange Bd. of Educ.*, 998 F. Supp. 2d 338, 352 (D.N.J. 2014) ("There is . . . no fundamental right to a public education under the United States Constitution.").  Accordingly, because Plaintiffs are not members of a suspect class, and because the challenged regulations do not impinge upon a fundamental right,

---

[19] Indeed, even assuming that students with disabilities were a suspect class under the Equal Protection Clause, and even if the Equal Protection Clause permitted Plaintiffs to assert a claim based on their association with students with disabilities, the Court could not find that the challenged regulations draw a distinction on the basis of disability.  In that regard, Plaintiffs do not allege unequal treatment on the basis of serving students with disabilities.  Rather, the distinction highlighted by Plaintiffs is between APSSDs and public schools that serve students with disabilities.  Accordingly, because Plaintiffs' Equal Protection claim is based on *where* students with disabilities are educated (*i.e.*, in private school rather than public school), rather than on the disability classification, the Court cannot find that Plaintiffs are members of a suspect class based on the fact that they serve students with disabilities.

the Court will apply a rational basis standard of review to the Department's regulations concerning APSSD tuition reimbursement.

Under the rational basis standard of review, state regulations that "neither employ a suspect classification nor impinge a fundamental right are 'entitled to a presumption of validity against attack under the Equal Protection Clause.'" *Schumacher*, 965 F.2d at 1269 (quoting *Parham v. Hughes*, 441 U.S. 347, 351 (1979)). To that end, a state regulation "must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 876 (3d Cir. 2012) (quoting *Alexander v. Whitman*, 114 F.3d 1392, 1407 (3d Cir. 1997)); *see Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end."). Moreover, "those attacking the rationality of the . . . classification have the burden 'to negative every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). And, in evaluating with a state regulation is rationally related to a legitimate interest, courts "are free to consider any conceivable . . . purpose and are not limited to considering only the goal stated by the state actor." *Steel Valley*, 706 F.3d at 216 (citation and quotation marks omitted).

A state "need not provide justification or rationale" for its regulatory decision. *State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 643 F. Supp. 2d 615, 625 (D.N.J. 2009), *aff'd*, 399 F. App'x 752 (3d Cir. 2010). Indeed, the Supreme Court has held that "legislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

That is not to say that a classification may be arbitrary and capricious, only that a statutory classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . . so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 76 (1971) (citation omitted). Most importantly, the Supreme Court has emphasized that rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," even if at best they can be described as ill-advised, improvident decisions. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *Beach Commc'ns*, 508 U.S. at 313); *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (finding that "the judiciary [may not] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."). Thus, once a court finds there is a credible reason for a regulatory action, the regulation must be upheld. *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179 (1980).

Here, Defendants cite two main justifications for the Department's regulations governing the calculation of APSSD tuition reimbursement: (i) promoting fiscal accountability in the provision of educational support services, in order to avoid the potential mismanagement of public monies; and (ii) ensuring consistency and transparency through the promulgation of regulations that set forth the exact means by which tuition reimbursement shall be provided. *See* Defs.' Br. at 27-29. Given the "deferential standard" that must be employed when considering a state regulation under rational basis review, *Steel Valley*, 706 F.3d at 217, Defendants' stated justifications suffice to uphold the Department's regulations regarding the calculation of APSSD tuition. In that regard, there are easily conceivable rational bases in providing clear standards by which APSSDs that contract with public school districts must calculate tuition. For one,

mandating that APSSDs conform their costs and methods of calculating tuition with the Department's regulations promotes fiscal accountability and the proper expenditure of public funds. Additionally, the Department's maximum salary regulations – providing that the APSSD must not exceed the highest contracted salaries by job title for any individual employed by a school district in the APSSDs county for any prior year, N.J.A.C. § 6A:23A-18.2(o) – ensure that salaries paid to related service providers are tied to reasonable benchmarks, *i.e.*, those paid by public school districts in the same county. Accordingly, because Plaintiffs have not demonstrated, as they must to overcome rational basis review,[20] that "no 'reasonably conceivable state of facts' could support a rational basis" for the Department's regulatory classification, *State Troopers*, 399 F. App'x at 755 (quoting *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993)), Plaintiffs' Equal Protection claim is dismissed.

### 2. *Due Process Claims*

In Counts Two and Three of the Amended Complaint, Plaintiffs assert claims under the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. In the case at bar, Plaintiffs assert that the Department's regulations violate both the procedural and substantive components of the Due Process Clause.

### a. *Procedural Due Process*

---

[20] Indeed, despite their burden to negate "every conceivable basis" which might support the state's regulatory classification, *Beach Commc'ns*, 508 U.S. at 315, Plaintiffs hang their hat entirely on the application of strict scrutiny, and thus, fail to respond to any of Defendants' justifications for the Department's regulations.

In Count Two of the Amended Complaint, Plaintiffs assert a claim for violation of procedural due process. *See* Am. Compl. ¶¶ 158-62. Specifically, Plaintiffs allege that the Department "deprived [Plaintiffs] of their liberty when it reversed its position regarding its enforcement of maximum salaries for related-service providers and its requirement that related-service be provided directly by [APSSDs]," without affording Plaintiffs notice or an opportunity to be heard. *Id.* at ¶ 160

To state a claim for violation of procedural due process, Plaintiffs must allege that: "(1) they were deprived of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty, or property; and (2) that the procedures available did not provide due process of the law." *State Troopers*, 399 F. App'x at 755. Here, the Court need not reach the second step of that inquiry, because Plaintiffs have failed to allege the deprivation of an interest protected under the Due Process Clause.

As noted, the threshold inquiry in determining whether Plaintiffs have sufficiently alleged a procedural due process claim is whether Plaintiffs have alleged the deprivation of a protected liberty or property interest. *Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa*, 385 F. App'x 135, 141 (3d Cir. 2010). Here, identifying the exact contours of the underlying interest that forms the basis of Plaintiffs' due process claim is complicated by the imprecision of both the Amended Complaint and Plaintiffs' briefing. To wit, in Count Two of the Amended Complaint, Plaintiffs allege that the Department "deprived [Plaintiffs] of their *liberty* when it reversed its position regarding its enforcement of maximum salaries for related-service providers and its requirement that related-services be provided directly by [APSSDs]," Am. Compl. ¶ 160 (emphasis added), yet seek a declaration that the Department's actions deprived Plaintiffs of their "liberty *and property* without due process of law." *Id.* at 25 (emphasis added). However,

Plaintiffs' Opposition brief is focused solely on the deprivation of a *property* interest, without any reference to Plaintiffs' *liberty* interests. *See* Pls.' Br. at 26-28. Specifically, Plaintiffs contend that 'there is a clear *property* interest at stake: funds," *id*. at 27 (emphasis added), and argue that the Department's decision to enforce maximum salary limitations for related service providers and to require APSSDs to provide all related services directly resulted in significant losses to APSSDs, who had relied on the Department's "past practice of reimbursing [APSSDs] for all related-service costs." *Id*. at 28. Accordingly, because Plaintiffs fail to identify any specific liberty interest at issue, and because the Court cannot glean one from the Amended Complaint, the Court will constrain its analysis to whether Plaintiffs have sufficiently alleged the deprivation of a protected property interest. Because I find that Plaintiffs have not, Plaintiffs have not stated a viable procedural due process claim.

"'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Roth*, 408 U.S. at 577. "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting *Roth*, 408 U.S. at 577).

Here, even accepting as true Plaintiffs' allegation that, prior to the Department's June Memorandum, the Department reimbursed APSSDs for the costs of providing all related services, the Court cannot find that Plaintiffs have a legitimate entitlement to the unregulated receipt of public funds covering the costs of any and all related services. Significantly, Plaintiffs have failed to identify any statutory or constitutional provision guaranteeing APSSDs a specific level of funding as compensation for providing related services to students with disabilities. Rather, the Plaintiff-APSSDs' entitlement to tuition reimbursement funds stems from the Tuition Contract, which requires APSSDs "to comply with all requirements promulgated by the [Department]," and states that "[t]uition charges . . . as well as the payment of the same shall be made in accordance with the applicable New Jersey Statutes and the rules and regulations of the State Board of Education." Am. Compl., Ex. A at ¶¶ 3-4. In turn, New Jersey confers upon the Commissioner of Education and the State Board of Education the authority to prescribe rules governing the calculation of APSSD tuition. *See* N.J.S.A. § 18A:46-2. Under this regulatory scheme, the Court cannot find that Plaintiffs had a legitimate entitlement to an unfettered amount of tuition reimbursement funds. To the contrary, Plaintiffs were on notice that their receipt of tuition reimbursement funds was conditioned on compliance with the Department's regulations. Accordingly, because Plaintiffs did not have a legitimate claim to unencumbered tuition reimbursement, or to particular regulations being in place, they have not sufficiently alleged a deprivation of a property right protected by procedural due process. *See McLemore v. City of Trenton*, No. 05-4631, 2007 WL 2112341, at *4 (D.N.J. July 19, 2007) (finding that the plaintiff did not have a property interest in a specific level of salary, where New Jersey conferred upon municipalities "the unfettered authority to designate salary ranges.").

      *b.*     *Substantive Due Process*

In Count Three of the Amended Complaint, Plaintiffs assert a substantive due process claim, alleging that the state deprived Spectrum360, HollyDELL, Ms. Grossi, and Ms. Homa "of economic liberty via unlawful contract and compensation limitations."  Am. Compl. ¶ 166.

In evaluating Plaintiffs' substantive due process claim, I note, at the outset, that "different standards govern depending on whether an individual challenges a legislative act or a non-legislative state action." *Loscombe v. City of Scranton*, 600 F. App'x 847, 852 (3d Cir. 2015). Substantive due process challenges to a legislative or regulatory act are reviewed under a rational basis test. *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).  While the rational basis test is "not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), the defendant need only demonstrate that the act is "rationally related to some legitimate government purpose." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000).

In contrast, when a plaintiff challenges a non-legislative action as violative of substantive due process, the plaintiff must demonstrate:  (1) "that a state actor engaged in conduct that deprived him of a protected property interest and [2] that the deprivation shocks the conscience." *Edwards v. Dep't of Human Servs.*, 725 F. App'x 181, 184 (3d Cir. 2018).  Significantly, "'not all property interests worthy of procedural due process protection are protected by the concept of substantive due process.'" *Nicholas*, 227 F.3d at 140 (quoting *Reich v. Beharry*, 883 F.2d 239, 244 (3d Cir. 1989)).  Rather, substantive due process only protects those interests that are "fundamental . . . under the Constitution." *Barnett v. Penn Hills Sch. Dist.*, 705 F. App'x 71, 74 (3d Cir. 2017); *see Nicholas*, 227 F.3d at 140 (explaining that whether a property interest is protected by substantive due process "is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution.").  If the

interest being deprived is "fundamental" under the Constitution, "then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used." *Nicholas*, 227 F.3d at 142. Government action is arbitrary or irrational where it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998). However, if the interest being deprived is not "fundamental," then "the governmental action is entirely outside the ambit of substantive process . . . ." *Nicholas*, 227 F.3d at 142.

Here, the parties dispute whether Plaintiffs' substantive due process claim challenges a legislative act and thus is subject to rational basis scrutiny, or challenges a non-legislative state action and thus is subject to the "shock the contemporary conscience" test. In that regard, Defendants argue that Plaintiffs' substantive due process challenge goes to the Department's broad regulations concerning APSSD tuition reimbursement, and thus, need only withstand rational basis review. *See* Defs.' Br. at 29-30. Defendants further contend that the "Department's regulatory scheme sets forth a well-reasoned policy judgment regulating the means by which all APSSDs should calculate their tuition costs and setting the maximum salary costs comparable to the highest salaries charged in comparable jobs in the country," and thus, is rationally related to a legitimate state interest. *Id.* at 30. Conversely, Plaintiffs' briefing regarding their substantive due process claim focuses on the standard governing non-legislative acts. *See* Pls.' Br. at 20-26. In that regard, Plaintiffs argue that the Department's actions have deprived them of "fundamental interests in contracting, working and earning a living, and maintaining specific private employment." *Id.* at 22. Plaintiffs further contend that the state action shocks the conscience, because it precludes disabled students attending APSSDs from receiving the support of the most experienced related service providers. *Id.* at 25-26.

Contrary to Plaintiffs' arguments, the Court finds that Plaintiffs' substantive due process claim challenges a regulatory act, and thus, is subject to rational basis review. In distinguishing legislative acts and non-legislative or executive acts, the Third Circuit has explained that "'[e]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society.'" *Nicholas*, 227 F.3d at 139 n. 1. Here, the Department's regulations governing APSSD tuition and maximum salaries for related service providers constitute a regulatory act – they apply broadly to all APSSDs, rather than a selective set of individuals. Additionally, for substantially the same reasons set forth in this Court's Equal Protection analysis, the Department's regulations withstand rational basis review. That is, the Department's regulations regarding APSSD tuition reimbursement and maximum salary limitations are rationally related to a legitimate state interest in ensuring fiscal accountability and the proper expenditure of public monies.[21]

Moreover, even if Plaintiffs' substantive due process claim could be construed as a challenge to a non-legislative act, Plaintiffs' claim still fails, because Plaintiffs have not sufficiently alleged that the Department's regulations deprived them of a fundamental right that is protected by substantive due process. To reiterate, Plaintiffs allege that the Department deprived them of their "fundamental interests in contracting, working and earning a living, and maintaining specific private employment." Pls.' Br. at 22. While Plaintiffs are correct that "the right . . . to engage in any of the common occupations of life" is a fundamental liberty protected under the Constitution, *Whitman*, 114 F.3d at 1403; *see Piecknick v. Com. of Pa.*, 36 F.3d 1250,

---

[21] Indeed, while Plaintiffs have the burden of negating every conceivable basis which might support the Department's regulations, *see Sidamon-Eristoff*, 669 F.3d at 366, they fail altogether to argue that the Department's regulations lack a rational basis.

1259 (3d Cir. 1994) ("The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments."), the Third Circuit has clarified that "[i]t is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Piecknick*, 36 F.3d at 1259 (citation and internal quotation marks omitted). More specifically, the "Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits . . . brought directly under the due process clause." *Id*. (citation and internal quotation marks omitted). Here, Plaintiffs have not alleged that the Department's regulations deprived them of the opportunity to pursue a certain calling or occupation altogether, or even to work as a related service provider for an APSSD; rather, Plaintiffs merely contend that they are unable to obtain the salary that they desire. This is not the sort of fundamental employment interest protected under the Constitution. Accordingly, because Plaintiffs have failed to allege the deprivation of an interest protected under the Constitution, Plaintiffs' substantive due process claim must be dismissed.

### 3. *Contracts Clause*

In Count Five of the Amended Complaint, Plaintiffs assert a claim under the Contracts Clause of the United States Constitution.[22] Am. Compl. ¶¶ 172-76. Specifically, the Plaintiff-APSSDs allege that, under the Department-mandated Tuition Contract, they are required to provide all of the services required under a student's IEP. *See id*. at ¶¶ 175-76. Plaintiffs further allege that, as a result of the Department's maximum salary limitations, they cannot provide the

---

[22] Count Five also asserts that Defendants violated New Jersey's corollary to the Contracts Clause, N.J. CONST. art. 4, § 7. Am. Compl. ¶ 174.

related services set forth in students' IEPs; and thus, that the maximum salary limitations impair their ability to fulfill a requirement of the Tuition Contract.[23]  *See id.*

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  It provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  U.S. CONST. art. I, § 10, cl. 1.  While the Contracts Clause "applies to any kind of contract . . . not all laws affecting pre-existing contracts violate the Clause." *Sveen*, 138 S. Ct. at 1821.  In that regard, courts apply a two-step test to determine whether a state law or regulation violates the Contracts Clause.  *Id.*  The threshold inquiry is whether the state law has "operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978).  In answering that question, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822; *see United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) ("To assess whether there has been an impairment of a contractual

---

[23] In their Opposition brief, Plaintiffs argue that, in addition to the Tuition Contract, the Department's regulations also interfered with "individual employment contracts with related-service providers . . . and service contracts with independent contractor therapists or outside agencies." Pls.' Br. at 31.  Significantly, however, Count Five the Amended Complaint, Plaintiffs' Contracts Clause claim, fails to reference any contract outside of the Tuition Contract. *See* Am. Compl. at 29 (seeking a "declaration that the [Department's] maximum salary requirements . . . unconstitutionally impaired [APSSDs'] related-service obligations *under their mandated tuition contracts*.") (emphasis added).  Accordingly, because it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted), and because Plaintiffs' Contracts Clause claim, as pled, only relates to the Tuition Contract, this Court will not consider Plaintiffs' Contract Clause arguments with respect to contracts other than the Tuition Contract on this Motion. *See Bell v. City of Philadelphia*, 275 Fed. Appx. 157, 160 (3d Cir. 2008) (observing that "a plaintiff may not amend his complaint through arguments in his brief in opposition . . . .".

relationship, we ask whether legitimate expectations have been thwarted.").  Relevant here, in determining the existence of substantial impairment, courts also "consider whether the industry the complaining party has entered has been regulated in the past."[24]  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983); *see Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) (upholding a state law against a Contracts Clause attack, based in part on the fact that when the plaintiff "purchased into an enterprise already regulated in the particular [manner] to which he now objects, he purchased subject to further legislation upon the same topic.").

If the state law constitutes a substantial impairment, "the inquiry turns to the means and ends of the legislation"; namely, "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Sveen*, 138 S. Ct. at 1822 (citation omitted).  More specifically, where a plaintiff meets its burden of alleging substantial impairment, the court must, first, determine whether there is "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or *economic* problem."  *Energy Reserves*, 459 U.S. at 411-12 (emphasis added).  "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'"  *Id*. at 412 (citation omitted).

---

[24] Indeed, as the Supreme Court "long ago observed: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.'"  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (quoting *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908)).

Here, Plaintiffs have not stated a claim under the Contracts Clause, because they fail to sufficiently allege that the Department's regulations substantially impair a contractual obligation, such that the legitimate expectations of the parties were thwarted. *See Transp. Workers Union of Am., Local 290 By & Through Fabio v. Se. Pennsylvania Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998) ("The purpose of the Contract Clause is to protect the legitimate expectations that arise from such contractual relationships from unreasonable legislative interference."). In that regard, Plaintiffs' Contracts Clause claim, distilled to its essence, is that the Department's regulations interfere with their ability to provide the related services necessary to fulfill students' IEPs. However, Plaintiffs' claim ignores the fact that the Tuition Contract itself conditions APSSDs' approved status on compliance with all Department regulations, including those setting forth the manner in which tuition reimbursement will be paid. See Am. Compl., Ex. A at ¶ 3 ("Tuition charges . . . as well as payment of the same shall be made in accordance with the applicable New Jersey Statutes and the rules and regulations of the State Board of Education."). Stated differently, under the Tuition Contract, an APSSD's ability to provide the related services necessary to fulfill a student's IEP within the tuition reimbursement regulations promulgated by the Department is a condition precedent to its right to receive students from a sending district. Absent compliance with those provisions, APSSDs have no reasonable expectation that may be thwarted. In short, it would strain credulity to find that the Tuition Contract was impaired by the Department's regulations, where compliance with those regulations formed the bargain on which that Contract was executed.

Indeed, in light of the fluid regulatory environment in which the Tuition Contract was executed, this Court cannot find that Plaintiffs' legitimate expectations were thwarted when the Department enforced its regulations governing APSSD tuition reimbursement. *See Energy*

*Reserves*, 459 U.S. at 413–16 (noting the impact of a fluid regulatory climate on a Contracts

Clause claim).  In *Energy Reserves*, a natural gas supplier brought suit alleging that a state law

impaired the supplier's contracts with a public utility.  *Id*. at 409.  In finding that the supplier

failed to demonstrate the existence of substantial impairment, the Court emphasized the

importance of the regulatory background underlying the parties' contract, stating as follows:

> Significant here is the fact that the parties are operating in a heavily regulated industry. State authority to regulate natural gas prices is well established. At the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, but its supervision of the industry was extensive and intrusive. Moreover, under the authority of § 5(a) of the 1938 Natural Gas Act, the Federal Power Commission (FPC) set "just and reasonable" rates for prices of gas both at the wellhead and in pipelines. Although prices in the intrastate market have diverged somewhat from those in the interstate market due to the recent shortage of natural gas, the regulation of interstate prices effectively limits intrastate price increases.

> It is in this context that the indefinite escalator clauses at issue here are to be viewed. In drafting each of the contracts, the parties included a statement of intent, which made clear that the escalator clause was designed to guarantee price increases consistent with anticipated increases in the value of ERG's gas. While it is not entirely inconceivable that ERG in September 1975 anticipated the deregulation of gas prices introduced by the Act in 1978, we think this is highly unlikely and we read the statement of intent to refer to nothing more than changes in value resulting from changes in the federal regulator's "just and reasonable" rates. In exchange for these anticipated increases, KPL agreed to accept gas from the Spivey-Grabs field for the lifetime of that field. Thus, at the time of the execution of the contracts, ERG did not expect to receive deregulated prices. The very existence of the governmental price escalator clause and the price redetermination clause indicates that the contracts were structured against the background of regulated gas prices. If deregulation had not occurred, the contracts undoubtedly would have called for a much smaller price increase than that provided by the Kansas Act's adoption of the § 109 ceiling.

> Moreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law. *This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim. Regardless of whether this interpretation is correct, the provision does suggest that ERG knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations. Reading the Contract Clause as ERG does would mean that indefinite price escalator clauses could exempt ERG from any regulatory limitation of prices whatsoever. Such a result cannot be*

> *permitted*. In short, ERG's reasonable expectations have not been impaired by the Kansas Act.

*Id.* at 413-16 (emphasis added and internal citations omitted).

Similarly, here, the regulatory climate in which the Tuition Contract was executed lends credence to this Court's finding that Plaintiffs' reasonable expectations were not thwarted by the Department's regulations. In that regard, the state's authority to regulate tuition reimbursement for private schools for students with disabilities is well-established. *See Windsor*, 2008 WL 113992 at *3 (observing that, although New Jersey permits APSSDs to charge sending districts for the tuition of each child sent to their schools, the "calculation of the tuition rates is *strictly regulated*.") (emphasis added); *Council of Private Sch. for Children With Special Needs, Inc. v. Cooperman*, 205 N.J. Super. 544, 545-46 (App. Div. 1985) (sustaining the Department's 1984 regulations governing tuition reimbursement for private schools for disabled children). Moreover, like the price regulation provision at issue in *Energy Reserves*, here, the provision in the Tuition Contract requiring APSSDs to comply with all Department regulations as a condition of their approved status could be interpreted to incorporate all future regulation of tuition reimbursement. *See Energy Reserves*, 459 U.S. at 416. At a minimum, Plaintiffs were aware, at the time they entered into the Tuition Contract, that the Department strictly regulated tuition reimbursement, and that future regulations were "foreseeable as the type of law that would alter contract obligations." *Id.* Under these circumstances, the Court cannot find that Plaintiffs' reasonable expectations were thwarted by the Department's regulations.

In arguing that they have sufficiently alleged a claim for violation of the Contracts Clause, Plaintiffs point to the Third Circuit's decision in *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201 (3d Cir. 2016). In *United Steel*, unions and other collective bargaining representatives

brought actions alleging that the Virgin Islands Economic Stability Act of 2011 ("VIESA"), which reduced the salary of most state employees by 8%, violated the Contracts Clause. *See id*. at 205. The collective bargaining agreements at issue set forth "detailed payment schedules that specif[ied] the wages or salaries and benefits for all of the employees covered in the agreements," stated that no modification to the agreements could occur without the consent of both the government and the union, and provided that the union employees gave up various rights during the agreements, including the right to strike. *See id*. at 206. Following a bench trial, the District Court dismissed the plaintiffs' Contracts Clause claim, finding that although VIESA substantially impaired the parties' contractual relationship, such impairment was justified. *Id.* at 207.

The Third Circuit reversed, holding that "VIESA substantially impaired the . . . collective bargaining agreements, and such impairment was unreasonable." *Id*. at 215. With respect to the substantial impairment prong of the Contracts Clause analysis, the court noted, as a preliminary matter, that the government had conceded that if any impairment of the contractual relationship existed, it was substantial, and thus, that its inquiry was limited to whether the agreements were impaired. *See id.* at 210. Next, in finding that VIESA impaired the collective bargaining agreements, the court found that VIESA thwarted the employees' legitimate expectations of payment in accordance with the terms of the agreements. *See id*. at 210-11. Specifically, the court emphasized that the collective bargaining agreements set forth detailed payment and benefits schedules at which union employees were to be compensated, and that the government had already approved appropriations to pay for those salaries. *Id.* at 210. The court further observed that the employees had made various concessions, such as their right to strike, and that in exchange for those concessions, the employees "expected that they would receive the salary

provided for in the collective bargaining agreements." *Id.* at 210-11.  Additionally, pointing to the provisions in the agreements stating that no modification could occur without mutual assent, the court explained that the "employees' expectation that they would receive the benefit of their bargain without unilateral modification by the Government was therefore a reasonable expectation." *Id.* at 211.

Contrary to Plaintiffs' arguments, however, *United Steel* is distinguishable from the present case.  As an initial matter, unlike in *United Steel*, here, the Tuition Contract does not set forth a specific payment schedule; to the contrary, it provides that tuition payments shall be made in accordance with the Department's regulations.  *See* Am. Compl., Ex. A at ¶ 3.  Nor have Plaintiffs pointed to any provision of the Tuition Contract providing that the same cannot be modified without mutual consent.  As such, the Court cannot find that Plaintiffs had a legitimate expectation that sending districts would reimburse APSSDs for any and all costs incurred in providing related services to students.  Accordingly, because Plaintiffs have failed to allege that the Department's regulations substantially impaired an existing contract, Plaintiffs' Contracts Clause claim is dismissed.

### D.    Supplemental Jurisdiction

Having found that dismissal is warranted as to Plaintiffs' federal claims, asserted in Counts One, Two, Three, and Five of the Amended Complaint, the Court next addresses Plaintiffs' remaining state law claims.  In that regard, the Amended Complaint contains five state law claims:  (i) Count Four – Plaintiffs' claim for violation of the right to a thorough and efficient education under the New Jersey Constitution; (ii) Count Five – Plaintiffs' claim for impairment of the New Jersey Constitution's corollary to the Contracts Clause; (iii) Count Six – Plaintiffs' claim for violation of the NJAPA; (iv) Count Seven – Spectrum360's stand-alone

claim for a declaratory judgment and injunctive relief; and (v) Count Eight – HollyDELL's stand-alone claim for a declaratory judgment and injunctive relief.[25]

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Because Plaintiffs' remaining claims arise solely under state law, and therefore are not claims over which I have original jurisdiction, I decline to exercise supplemental jurisdiction over those claims. As a result, Defendants' Motion to Dismiss is denied without prejudice, insofar as Defendants seek the dismissal of Plaintiffs' state law claims.

## V.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss Counts One, Two, Three, and Five of the Amended Complaint, insofar as Plaintiffs assert federal claims, is GRANTED. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims,

---

[25] With respect to Counts Seven and Eight, as noted in this Court's June 30, 2017 Opinion, courts within the Third Circuit routinely dismiss stand-alone counts for declaratory and injunctive relief, since such claims are requests for remedies, and not independent causes of action. *Chruby v. Kowaleski*, 534 Fed. Appx. 156, 160 n. 2 (3d Cir. 2013); *see Kabbaj v. Google Inc.*, 592 Fed. Appx. 74, 75 n. 2 (3d Cir. 2015) (affirming dismissal of count for declaratory and injunctive relief, because "declaratory and injunctive relief are remedies rather than causes of action."); *see also Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *9 (D.N.J. May 31, 2017) (dismissing separate counts as improper, since "injunctive and declaratory relief are remedies— not independent causes of action."); *Cole v. NIBCO, Inc.*, No. 13-7871, 2015 WL 2414740, at *15 (D.N.J. May 20, 2015) (holding that "declaratory relief and injunctive relief, as their names imply, are remedies, not causes of action."); *Lee Dodge, Inc. v. Kia Motors Am., Inc.*, No. 10-5939, 2011 WL 3859914, at *1 n.1 (D.N.J. Aug. 31, 2011) (dismissing counts for declaratory judgment and injunctive relief because they "are not substantive claims but rather requests for remedies"). Accordingly, to the extent that Plaintiffs are attempting to assert a federal claim for injunctive and declaratory relief in connection with Counts Seven and Eight, those claims are dismissed. To the extent that Plaintiffs are attempting to assert causes of action under state law, the Court declines to exercise supplemental jurisdiction over the same.

and thus, Defendants' Motion is DENIED without prejudice as to the remainder of the Amended

Complaint.

Dated:  July 26, 2018                                    /s/ Freda L. Wolfson
                                                        Hon. Freda L. Wolfson
                                                        United States District Judge